[Crim. No. 21858. May 24, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN WILLIAM ZIMMERMAN, Defendant and Appellant.

**COUNSEL**

Dennis L. Cava, under appointment by the Supreme Court, and Karl H. Henry for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

Stanley M. Roden, District Attorney (Santa Barbara), and Gerald McC. Franklin, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant appeals from a judgment convicting him of two counts of burglary, rape, and two counts of first degree murder with special circumstances, and sentencing him on the latter to life imprisonment without possibility of parole.

Because defendant does not challenge the sufficiency of the evidence, we shall not dwell on the unpleasant facts of this case. It is enough for present

purposes to note that the jury found defendant guilty of burglarizing two homes, forcibly raping a preteenage girl in one of those homes, and brutally murdering both the girl and her brother. Each victim was bound and gagged while alive, and killed by multiple hammer blows on the head and multiple stab wounds in the neck.

The jury found the murders to be of first degree, and found true the charge of two special circumstances accompanying each murder count: i.e., that with intent to cause death defendant personally aided or committed the fatal acts and (1) the murder was willful, deliberate and premeditated and was committed during a forcible rape, and (2) defendant was convicted in this trial of more than one murder. (Former Pen. Code, § 190.2, subds. (c)(3)(iii) and (c)(5).) The jury could not reach unanimity on the question of punishment for the murders, however, and the trial court therefore imposed a sentence of life imprisonment without possibility of parole.

In so ruling the court acted in obedience to a statute which provided that "If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and impose a punishment of confinement in state prison for life without possibility of parole." (Former Pen. Code, § 190.4, subd. (b), 2d par.)[1] **(1a)** Defendant contends the quoted statute violated the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution. He expressly disavows any attack on the *penalty* of life imprisonment without possibility of parole, conceding it is "per se a valid sentence." Rather, he complains only of the fact that the statute made that sentence *mandatory* when the jury could not agree on punishment; by so providing, he argues, the statute did not permit the sentencing authority to consider evidence of mitigating circumstances, and did not furnish specific guidelines (see, e.g., Pen. Code, § 190.3, 6th par.) for determining whether life imprisonment without possibility of parole was the appropriate penalty in the particular case.

These are the very defects, of course, that the United States Supreme Court found in the North Carolina statute making the *death penalty* mandatory in all cases of first degree murder (*Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]; see also *Roberts* v.

---

[1]The statute, in effect at the time of the crimes herein (Stats. 1977, ch. 316, § 12, p. 1261), was repealed by initiative in 1978. The corresponding statute in force today (Pen. Code, § 190.4, subd. (b), 2d par.) is essentially similar, providing that if the jury is unable to agree on penalty, (1) the court shall order a new jury to try the issue, and (2) if the second jury is also unable to agree, the court shall in its discretion either (a) order a third jury to try the issue or (b) impose a sentence of life imprisonment without possibility of parole.

*Louisiana* (1976) 428 U.S. 325 [49 L.Ed.2d 974, 96 S.Ct. 3001]), and that we found in an earlier California statute making the death penalty mandatory in all cases of first degree murder with special circumstances (*Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101]). Defendant contends the holding of those decisions is equally applicable when the mandatory penalty is life imprisonment without possibility of parole.

The contention is refuted on the face of *Woodson,* the lead case of the group. There the plurality opinion recognized the "prevailing practice" of individualizing the sentencing process by taking account of the circumstances of the offense and the character of the offender, but observed that the practice "reflects simply enlightened policy rather than a constitutional imperative" (428 U.S. at p. 304 [49 L.Ed.2d at p. 961]). The opinion did hold, of course, that the Eighth Amendment requires such individualized sentencing in capital cases (*ibid.*), but it carefully explained that "[t]his conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Id.* at p. 305 [49 L.Ed.2d at p. 961]; accord, *Rummel* v. *Estelle* (1980) 445 U.S. 263, 272 [63 L.Ed.2d 382, 389, 100 S.Ct. 1133].)

Because the penalty of life imprisonment without possibility of parole is "a sentence of imprisonment, however long," it is expressly exempted from the constitutional requirement of individualized sentencing in capital cases. Defendant concedes this point, but asserts that life without parole is itself "qualitatively different" from any other sentence of imprisonment. He argues that persons so punished lose all hope of release and suffer great mental anguish, and he speculates that some may even prefer death.

We do not underestimate the gravity of the penalty in question: it is, and is intended to be, the heaviest penalty short of death. Yet it remains fundamentally different from death in the one respect so often emphasized in Eighth Amendment jurisprudence: time and again the high court opinions reason that capital punishment is "final" and "irrevocable" in the obvious sense that after it is carried out there is no possibility of rehabilitation, clemency, or belated relief because of factual mistake or change in the law. (See, e.g., *Furman* v. *Georgia* (1972) 408 U.S. 238, 289-290 [33 L.Ed.2d 346, 378, 92 S.Ct. 2726] [conc. opn. of Brennan, J.]; *id.* at p. 306 [33 L.Ed.2d at p. 388] [conc. opn. of Stewart, J.]; *Gregg* v. *Georgia* (1976) 428 U.S. 153, 187 [49 L.Ed.2d 859, 882, 96 S.Ct. 2909] [plur. opn.].)

Thus in *Lockett* v. *Ohio* (1978) 438 U.S. 586, 605 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954], the court observed that "A variety of flexible techniques—probation, parole, work furloughs, to name a few—and various postconviction remedies may be available to modify an initial sentence of confinement in noncapital cases," and premised the Eighth Amendment requirement of individualized capital sentencing on the evident unavailability of such "corrective or modifying mechanisms" with regard to an executed death penalty. In language particularly relevant here, the court further noted (*id.* at fn. 13) that "Sentencing in noncapital cases presents no comparable problems. We emphasize that in dealing with standards for imposition of the death sentence we intimate no view regarding the authority of a State or of the Congress to fix mandatory, minimum sentences for noncapital crimes."

The law of this state provides "corrective or modifying mechanisms" for individualizing, when appropriate, a potential punishment of life imprisonment without possibility of parole. To begin with, after the jury returns a verdict imposing that penalty the trial court may exercise its power under Penal Code section 1385 to dismiss the special circumstance findings in order to make the defendant eligible for parole. (*People* v. *Williams* (1981) 30 Cal.3d 470, 489 [179 Cal.Rptr. 443, 637 P.2d 1029].) The wise use of this power, we explained, "will promote the administration of justice by ensuring that persons are sentenced based on the particular facts of the offense and all the circumstances. It enables the punishment to fit the crime as well as the perpetrator." (*Ibid.*)[2]

Secondly, if the defendant is nevertheless sentenced to life imprisonment without possibility of parole the Governor may exercise the power of executive clemency to commute the sentence, for example to life imprisonment *with* possibility of parole. (Cal. Const., art. V, § 8.)[3] Implementing the constitutional provision, the Legislature has enacted a statutory scheme that authorizes the Board of Prison Terms to recommend to the Governor the names of all persons whose sentences should be commuted "on account of good conduct, or unusual term of sentence, or any other cause which, in their opinion, should entitle the prisoner to a . . . commutation of sentence." (Pen. Code, § 4801; see also Cal. Admin. Code, tit. 15, § 2815 et seq.) Every prisoner whose punishment is thus commuted to life imprison-

---

[2]It is true that defendant in the case at bar was sentenced before *Williams* was decided. At the time of such sentencing, however, the trial court stated for the record its "carefully considered opinion," based on the facts of the case, that this defendant should never be released on parole under any circumstances. From that statement we may fairly conclude that the court would not have dismissed the special circumstance findings even if it had known of its power to do so under section 1385.

[3]The sole qualification on this power is that if the prisoner has twice been convicted of felony, the Governor can commute only on recommendation of a majority of this court. (*Ibid.*) Such recommendations, at the invitation of a Governor, are rarely withheld.

ment with possibility of parole is entitled, of course, to be considered for release as if he had originally been sentenced to such imprisonment. (See Pen. Code, § 3040 et seq.) As we concluded in *Williams* (at p. 489, fn. 10, of 30 Cal.3d), this does not mean that for practical purposes there is "no such penalty" as life without possibility of parole; it means only that persons so sentenced do not necessarily "remain in prison for the rest of their lives." (*People* v. *Matthews* (1979) 98 Cal.App.3d 453, 458 [161 Cal.Rptr. 101].) Thus although defendant's sentence herein purports to deny him all possibility of parole, there is in fact "no insurmountable barrier against mitigation of the sentence if the time should come when the sentence appears to have served its purpose." (*Id.* at p. 459; accord, *People* v. *Noble* (1981) 126 Cal.App.3d 1011 [179 Cal.Rptr. 302].)

Defendant argues in effect that the foregoing constitutional and statutory provisions do not work: he claims that a sentence of life without parole is "practically" irreversible and that such a prisoner has no "realistic" chance for eventual release. The only evidence he offers in support is the fact that in the decade from 1969 to 1979 the Governor commuted the sentences of only four persons from terms of life without parole to terms of life with parole. He overlooks the explanation for this fact, i.e., that throughout that decade there were very few crimes punishable in California by life imprisonment without possibility of parole.[4] First degree murder, for example, was not so punishable until 1977; indeed, the legislative history of that amendment includes an accurate observation by the Senate Committee on the Judiciary (quoted in *People* v. *Williams, supra,* at p. 485 of 30 Cal.3d) to the effect that "Until now the penalty of life imprisonment without the possibility of parole has been rarely used in California." And few if any murderers sentenced to that punishment since that date, including defendant, have served even the minimum term for the parole of persons held under a sentence of straight life. (Pen. Code, § 3046.)

We conclude that defendant's constitutional attack on the penalty in this case is without merit.[5]

In addition, defendant complains of the procedure used to select the jury. He contends that the exclusion for cause of persons who would auto-

---

[4]One of the few was kidnaping for robbery or ransom: if the victim suffered bodily harm, life without possibility of parole was a sentencing alternative to death. (See former Pen. Code, § 209.) Some murderers were also serving sentences of life without possibility of parole because the Governor had commuted death sentences originally imposed on them.

[5]Nothing in this opinion is meant to imply that the existence of the Governor's power to commute can save a penalty of life imprisonment without possibility of parole—like any other penalty—from being invalidated in any case in which it is constitutionally disproportionate to the nature of the offense or the offender. (See *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-489 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].) In the case at bar defendant makes no such claim.

matically vote against the death penalty deprived him of a jury drawn from a representative cross-section of the community at the guilt phase, thus impairing his right to jury trial. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d].) Four members of this court rejected the same contention in *People* v. *Fields* (1983) 35 Cal.3d 329, 342-353 (plur. opn.), 374 [197 Cal.Rptr. 803, 673 P.2d 680] (conc. opn. by Kaus, J.).

■ He also contends he was denied a representative jury by the prosecutor's use of peremptory challenges to systematically exclude persons who had reservations about the death penalty but could have voted for it in a proper case. Insofar as this attack is directed to the guilt phase, it is without merit. In *Fields* (*id.* at p. 349) three members of this court were of the view that persons who would automatically vote against the death penalty are not a constitutionally cognizable class within the meaning of *Wheeler.* For the same reasons, we now hold that persons who merely have reservations about the death penalty are not such a class either, at least for the purpose of selecting a guilt phase jury. Insofar as the attack is directed to the penalty phase, we need not reach the issue in the case at bar because defendant was not sentenced to death; in these circumstances, even if there were error it would necessarily be harmless.[6]

The judgment is affirmed.

Broussard, J., and Paik, J.,* concurred.

**KAUS, J.**— ■ I concur in the affirmance of the judgment and in all of the reasoning of the majority with one exception, relating to the peremptory challenge issue. (*Ante,* this page.) As noted in my concurring opinion in *People* v. *Fields* (1983) 35 Cal.3d 329, 374 [197 Cal.Rptr. 803, 673 P.2d 680], I would not equate the constitutional standard governing peremptory challenges with the standard applicable to challenges for cause, and would not suggest that jurors with reservations against the death penalty are not a "constitutionally cognizable class." (*Ante,* this page.) In other contexts, serious constitutional questions would be presented by a statute which authorized the exclusion for cause of a category or "class" of persons on the basis of such shared ideological beliefs.

---

[6]Nor does defendant contend that the use of peremptory challenges to systematically exclude persons who had reservations about the death penalty denied him his due process right to a "neutral" or impartial penalty phase jury within the meaning of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. That issue, too, we leave to a case in which it is properly raised by a defendant under a sentence of death.

*Assigned by the Chairperson of the Judicial Council.

No such problems, however, are presented by this case. Just as a defendant violates no constitutional strictures in using his peremptory challenges to exclude prospective jurors who strongly favor the death penalty, the prosecution may properly use its limited number of peremptory challenges to exclude prospective jurors with reservations about the death penalty. Indeed, this is the classic use of the peremptory challenge—to exclude a prospective juror who a party fears will be unfavorable to him because of the juror's leanings on an issue related to the case.

**BIRD, C. J.,** Concurring and Dissenting.— I concur only in that portion of the majority opinion which concludes that a mandatory penalty of life without possibility of parole is not unconstitutional for failing to provide for individualized sentencing.

However, for the reasons expressed in my dissenting opinion in *People v. Fields* (1983) 35 Cal.3d 329, 374-386 [197 Cal.Rptr. 803, 673 P.2d 680], I dissent from that portion of the opinion which holds that appellant was not denied a representative jury at the guilt phase by the exclusion of all prospective jurors who would vote against the death penalty.

Reynoso, J., concurred.

Appellant's petition for a rehearing was denied July 12, 1984. Bird, C. J., was of the opinion that the petition should be granted.